Levana Lomma

5354 Makaloa Street

Kapa`a, Hi. 96746

Phone:  808-212-4628

E-mail:  levana@forourrights.org

In Propria Persona

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII
28 Feb. 2021 1:44 AM lrs
Michelle Rynne, Clerk of Court

# United States District Court
# District of Hawaii

| | |
|---|---|
| Levana Lomma | CASE NO. Civil 20-00456-JAO-RT |
| *Plaintiff,* ) | |
| ) | |
| v. ) | |
| ) | |
| CLARE E. CONNORS, in her ) | |
| individual and official capacity ) | |
| as Attorney General of the ) | |
| State of Hawai`i, ) | |
| DAVID Y. IGE, in his individual ) | |
| and official capacity as Governor ) | |
| of the State of Hawai`i, ) | |
| DEREK S.K. KAWAKAMI, in his ) | |
| individual and official capacity ) | |
| as Mayor of the County of Kaua`i, ) | |
| ) | |
| *Defendants* ) | |
| _____ ) | |

Verified Complaint                    1

**Second Amended Complaint for Declaratory**

**and Emergency Injunctive Relief**

*Plaintiff complains as follows:*

**Introduction**

1. This is a constitutional challenge to the current "Supplemental Proclamation Related to the Covid-19 Emergency" issued by the Defendant, Governor of Hawai`i, David Ige, on February 12, 2021, approved by Defendant Clare Connors as Attorney General of the state of Hawai`i and enforced by Defendant Derek S.K. Kawakami in the county in which plaintiff resides stating:

> *"All persons in the State shall wear a face covering over their nose and mouth when in public. The requirements of this statewide mask mandate are set forth in Exhibit J, which shall be enforced in each county."[1]*

2. The "Supplemental Proclamation Related to the Covid-19 Emergency" violates the plaintiff's First Amendment rights to free speech and expression under the United States Constitution by abridging the plaintiff's ability to speak audibly and clearly, removing facial expression which is an aspect of the content of speech, forcing the adoption of a cult-like religious tradition, which violates plaintiff's own

---

[1]
https://governor.hawaii.gov/wp-content/uploads/2021/02/2102078-ATG_Eighteenth-Proclamation-Related-to-the-COVID-19-Emergency-distribution-signed.pdf

religious convictions, and at the same time acts to obstruct plaintiff's God-given right to breathe freely and to simply be left alone, which are fundamental rights protected under the Ninth Amendment of the United States Constitution. The right to breathe, to bodily autonomy, privacy and the ability to freely move about, engage in commerce and associate with others are substantive rights protected under the Due Process Clause and therefore a regulation which impermissibly burdens these rights must pass strict scrutiny.

3. Neither the United States Constitution, nor any of the rights enumerated therein, are suspended in periods of emergency.

4. Plaintiff agrees that individual rights may, of necessity, be temporarily abridged because of an emergency.

5. Plaintiff asserts that an emergency is, by definition, an emergent situation and therefore of limited duration, not to be extended indefinitely without review of relevant facts justifying said emergency.

6. Plaintiff contends that the situation today has changed greatly from the situation when emergency mandates were first promulgated.  Not only have none of the doom-prophesying models of widespread death and destruction been borne into reality, but a highly effective Covid-19 vaccine is also now available, in addition to there being proven safe and effective therapeutics at our disposal as

well.

7. Even in a genuine emergency, the government may only abridge plaintiff's constitutional rights if the government can do two things:  1) Show a compelling public interest in issuing the rule that outweighs violating plaintiff's rights, and 2) Address the compelling public interest in the most specific and effective way possible so as to be least intrusive on plaintiff's rights.

8. Plaintiff asserts that in light of the actual low mortality rate of Covid-19 and the introduction of a highly effective vaccine to protect the vulnerable, as well as the availability of effective therapeutics, no compelling public interest exists to continue an emergency declaration and the deprivation of rights that goes along with it.  Plaintiff contends, and will prove in court, that if there was ever a reason to believe in a temporary public health emergency in Hawai`i, that reason no longer exists.

9. Plaintiff asserts, and will prove in court, that there is no scientific basis to the belief that wearing a face mask reduces the spread of a virus.

10. Plaintiff asserts, and will prove in court, that there is no scientific basis to the belief that asymptomatic persons are a significant vector of Covid-19 transmission.

11. Plaintiff asserts that since there is no scientific basis to the belief that

mask-wearing inhibits virus transmission, and asymptomatic transmission is effectively non-existent, mask-wearing is neither the most specific nor the most effective way to combat the spread of Covid-19.

12. Because mask wearing has been openly referred to as a symbol of "respect for others" by governments and leading health experts, without any scientific proof of its efficacy as a medical measure, the act of wearing a mask is primarily a cultural symbol of unity or a cult-like religious ritual.

13. The Supreme Court has previously ruled that governments must not be afforded the right to mandate "a feeling of unity in its citizens":

> "Recognizing that the right to differ is the centerpiece of our First Amendment freedoms, a government cannot mandate by fiat a feeling of unity in its citizens. Therefore, that very same government cannot carve out a symbol of unity and prescribe a set of approved messages to be associated with that symbol when it cannot mandate the status or feeling the symbol purports to represent."

*West Virginia Board of Education v. Barnette*, 319 U. S. 624 (1943)

14. Plaintiff asserts a right to relief from the Defendant's regulation because it is a rule which forces adherence to a cult-like ritual that interferes with Plaintiff's ability to practice her own religion. Refusal to wear the symbol of submission to the Cult of Covid and be initiated into the "New Normal" means Plaintiff must face discrimination and denial of access to goods and services, along with the threat of criminal prosecution. This arbitrary and capricious rule also infringes upon

Plaintiff's rights to free speech, expression, privacy and the right to freely

associate. The right to freedom in one's religious convictions is protected under the

First Amendment and a violation of such rights requires a strict scrutiny standard

of review.

15. Plaintiff additionally asserts that communication and expression are not

limited to the spoken word.  It is long established that kinesic cues including facial

expression are a fundamental component of effective human communication and

often convey messages without any inclusion of speech.[2]  Denial of the right to

give and receive non-verbal communication through facial expressions is an

infringement upon the content of speech.  Regulations which infringe upon the

content of speech require a strict scrutiny standard of review.

16. Finally, mounting scientific data shows prolonged face mask use may

cause long term health problems, a concern particularly applicable to employees

and school children who are forced to wear masks for extensive periods of time.

The risk of harm involved in mandating mask wearing must not be excluded in the

standard of review.

<u>The "Curve" Never Happened</u>

17. At the outset of the national call to lockdown the country we were told it

---

[2] https://ifioque.com/nonverbal-communication/kinesics_communication

was a necessary but temporary measure meant to lessen the strain on our healthcare system. As it turns out the dreaded curve never happened. The extra emergency supplies and makeshift hospitals across the country were simply not needed and all of them have since been dismantled. Centers for Disease Control (CDC) and State experts have said that we could flatten the curve but that the disease would continue to run through the population and that we simply would have to learn to live with it. Given this fact, it must be asked: if the curve has been flattened enough to take down temporary hospitals and we have no alternative but to live with it, then why is there still a need for an emergency? How could we possibly argue that the continuation of this emergency be considered anything but arbitrary and capricious – let alone act as justification for the limitation of fundamental rights subject to strict scrutiny?

Experts have known Covid-19 is not a true emergency since February, 2020

18. While lay people, politicians, and judges have been left helpless and at the mercy of health experts claiming "we just don't know enough" during the first lockdown phase, we are too far along now and have learned more than enough about the Covid-19 disease to allow the same set of health experts to hoodwink us into a second year of unjustified rights violations. Based on preliminary data out of China, as early as February, 2020, public health officials Anthony Fauci and

Robert Redfield, heads of the National Institutes of Allergies and Infectious

Diseases (NIAID) and the Centers for Disease Control and Prevention (CDC),

respectively, and members of the Presidential Task Force on Coronavirus,

acknowledged that Covid-19 was probably not as deadly of a virus as first thought

and may end up being close to the seasonal flu in number of deaths and number of

people infected (scientists use these two numbers -- number of deaths and number

of people infected -- to calculate something called the "mortality rate" or "case

fatality rate" of a virus, which is the single most important number in determining

whether a virus qualifies as a public health emergency).

19. On February 28, 2020, Fauci and Redfield wrote in an editorial in the

New England Journal of Medicine:

> "The case fatality rate (of Covid-19) may be considerably less than 1%. This
> suggests that the overall clinical consequences of Covid-19 may ultimately
> be more akin to those of a severe seasonal influenza (which has a case
> fatality rate of approximately 0.1%) or a pandemic influenza (similar to
> those in 1957 and 1968) rather than a disease similar to SARS or MERS,
> which have had case fatality rates of 9 to 10% and 36%, respectively."
> ("Covid-19 — Navigating the Uncharted," N Engl J Med 2020;
> 382:1268-1269
> DOI: 10.1056/NEJMe2002387)

20. Neither Fauci nor Redfield have retracted nor modified this prediction

about Covid-19 in any official manner since February, 2020, and most scientific

data since the publication of this article have verified that Covid-19 is akin to the seasonal flu in mortality rate.

21. In much the same way the electoral college was set up by the Framers of the Constitution to help expose and deter election fraud by preventing fraudulent excess votes in one or two counties from determining the president by popular vote, demanding that accurate death counts and infection numbers be reported and made transparent at the county level rather than at the state or national level helps prevent one or two counties from across the country from inaccurately categorizing Covid-19 as a "national emergency." Plaintiff asserts all public health emergency declarations must be done on a county by county level. Governor Ige's "Supplemental Proclamation" blanket face mask order for the entire state of Hawai`i therefore has no justification unless and until state health officials can show data in every county of Hawai`i results in mortality rates significantly above mortality rates for the seasonal flu.  It is highly unlikely, given even relatively inaccurate death numbers and infection numbers publicly available at the national level at the CDC for Hawai`i, that even a single county in Hawai`i can show Covid-19 constitutes a public health emergency.

<u>The mask rule is clearly not narrowly tailored</u>

22. Relying on broad scientific consensus is the best approach in order to

make the face mask data, arguments, and decisions more manageable and

fact-based. For example, it is scientific consensus that:

i) With the exception of top level N95 masks reserved exclusively for health care professionals, all other types of masks do little to prevent the mask wearer from inhaling Covid-19 aerosols. All face mask arguments should therefore be limited to how well masks work at preventing people from exhaling Covid-19 particles into the air, the main purpose of face mask requirements by government officials, according to government officials.

ii)  The best way to study the exhaled droplets and aerosols of infected people is to collect samples of droplets and aerosols directly from infected people, not samples of droplets and aerosols created from a machine.  In this way the most definitive experiment to date concerning mask efficacy was published in April, 2020, and studied droplets and aerosols exhaled from real coronavirus patients with and without masks [Leung, N.H.L., Chu, D.K.W., Shiu, E.Y.C. *et al.* Respiratory virus shedding in exhaled breath and efficacy of face masks. *Nat Med* 26, 676–680 (2020). https://doi.org/10.1038/s41591-020-0843-2].  Facts and data from this study alone should be determinative in arguments concerning the efficacy of face masks until this data is refuted by further studies.  This includes data showing droplets and aerosols from people infected with coronaviruses contained no virus particles unless the person coughed, suggesting that simply breathing or talking is not enough for infected individuals to spread Covid-19 through the air.

iii)  The best way to slow the spread of any respiratory virus like influenza (the seasonal flu), rhinoviruses (the common cold), and coronaviruses like Covid-19, is to consider both methods of transmission (airborne transmission through the air and surface transmission through touch), not just airborne transmission.  Face mask arguments tend to focus solely on airborne transmission of Covid-19 while ignoring the possible effect mass public face mask use has on increased transmission of Covid-19 through contact with contaminated surfaces, including an infected mask wearer touching his/her own contaminated mask after coughing into the mask or leaking nose mucous into the mask, then spreading the contamination to a myriad of public surfaces like shopping cart handles, pin pads, door knobs, door handles in the refrigerated foods section of the local grocery store, etc.

iv)  The best way to protect the public from health risks is to not ignore the most obvious health risk when making a decision about face masks, namely that face masks decrease the amount of oxygen intake for the wearer. Standards for safety concerning the use of face masks and respirators in the workplace have been established and regulated by the Occupational Safety and Health Administration (OSHA) for many years. OSHA has determined that anything under 19.5% for oxygen level places the mask wearer in danger of tachypnea (increased breathing rates), tachycardia (accelerated heartbeat), and impaired attention, thinking, and coordination even while at rest, which could lead to injury.[3] The data on oxygen deprivation by masks is much more definitive than any data showing masks prevent airborne transmission of Covid-19, at least not in a way that can just as easily be achieved by coughing into the crook of an elbow.

23. Using this method of scientific consensus to ferret out what is the best data available concerning the efficacy of face masks, then balancing the pros and cons of masks using the most reliable data available, it is clear the best approach to slowing the spread of Covid-19 with minimal health risk to the public is to instruct the public to:

i) avoid wearing masks so as not to decrease oxygen intake and so as to not accidentally contaminate public surfaces like doorknobs and shopping cart handles after touching a mask contaminated with virus particles.

ii) never cough into a mask and always cough into the crook of the elbow because that is the least likely place you will touch with your hands and contaminate your hands with virus particles.

This method also happens to be the best way to avoid infringing on plaintiff's

---

[3] https://www.osha.gov/laws-regs/standardinterpretations/2007-04-02-0

constitutionally protected rights, and is the method any jurisdiction must follow in order to meet the second prong of the strict scrutiny standard of review.

24. Plaintiff asks the court to declare the "Supplemental Proclamation Related to the Covid-19 Emergency" unconstitutional and issue an injunction barring defendants Clare E. Connors, David Y. Ige, and Derek S.K. Kawakami from enforcing this rule because the "Supplemental Proclamation Related to the Covid-19 Emergency" fails both prongs of the strict scrutiny standard of review and because there is a much better way to slow the spread of Covid-19 without impinging on the plaintiff's protected rights, namely, banning use of masks by the general public and instructing the public to cough into the crooks of their elbows. Plaintiff is requesting an emergency injunctive order because plaintiff's fundamental constitutionally protected rights are being violated by this regulation and irreparable harm is imminent if the Defendants are not barred from issuing and enforcing further orders of this nature.

**Jurisdiction and Venue**

25. This court has federal subject matter jurisdiction over this action because it is a constitutional challenge to a state law that violates the First and Ninth Amendments to the United States Constitution, an action which is allowed under Ex Parte Young 209 U.S. 123 (1908).

26. This court has supplemental jurisdiction over state claims under 28 U.S.C § 1367 and Plaintiff's request is not barred by the Eleventh Amendment because this lawsuit is seeking relief under federal law for rights violations occasioned only partly by defendants' violations of state law.

27. The District of Hawai`i is the proper venue for this action because the violation of plaintiff's First and Ninth Amendment rights by all "Supplemental Proclamations Related to the Covid-19 Emergency" occurred when plaintiff was forced to wear a face mask on October 2, 2020, at the Kauai Athletic Club at 5611 Kawaihau Road, Kapa'a, Hi. 96746, which is within the jurisdiction of this court.

## Standing

28. The three requirements of standing (injury, causation, and redressability) have been met because plaintiff's right to free speech, free expression, privacy, free association and religion as well as the right to breathe has been violated (injury), and plaintiff will most likely be injured again for as long as the Defendants executive orders and Supplemental Proclamations remains in effect in Hawai`i (imminent injury).  The injury was caused by Governor Ige's executive order and every Supplemental Proclamation he has issued since March 5, 2020, as well as Mayor Derek Kawakami's Emergency rules requiring plaintiff to wear a

mask while utilizing the Kauai Athletic Club in Kapa'a, Hi. (causation).[4]  Kauai

Athletic Club does not require members to wear masks unless there is a local or

state order requiring masks while exercising at Kauai Athletic Club.  But for the

Defendant's unconstitutional mask rules, Kauai Athletic Club never would have

required plaintiff to wear a face mask, infringing upon Plaintiff's rights to free

speech, expression, religion, privacy, free association, and right to breathe and

thereby forcing Plaintiff to cancel membership. The court can resolve this issue by

striking down the "Supplemental Proclamation Related to the Covid-19

Emergency" as unconstitutional and issuing an injunction barring the Defendants

from enforcing the law (redressability).

### Parties

29. Plaintiff Levana Lomma, is a lifelong resident of the state of Hawai`i,

currently residing in Kapa`a, in the County of Kaua`i. Plaintiff is a recently

unemployed hair stylist and mother of three children who have all been gravely

affected by restrictive Covid-19 mitigation tactics that have stripped them of their

usual routine and led to emotional distress.  Plaintiff is the Founder and Chief

Executive Officer of a non-profit civil rights organization on Kaua`i called For Our

---

[4]
https://www.kauai.gov/Portals/0/Civil_Defense/EmergencyProclamations/2010101
-COK_Mayor%27s%20Emergency%20Rule%20No_%2019%20%28part%201%2
9%20-%20signed.pdf

Rights and has dedicated her time to studying constitutional law to help preserve

the rights of the people of Hawai`i in the midst of what is being called a "state of

emergency" but instead appears to be a methodical destruction of the world

economy and humanity at large.

30. Defendant Clare E. Connors is the attorney general of Hawai`i and is

responsible for enforcing all the laws of Hawai`i, including the "Supplemental

Proclamation Related to the Covid-19 Emergency".

31. Defendant David Y. Ige is the Governor of the State of Hawai`i and is

responsible for issuing the "Supplemental Proclamation Related to the Covid-19

Emergency", which gives each county Mayor the authority to enforce the rule in

their jurisdiction.

32. Defendant Derek S.K. Kawakami is the Mayor of the County of Kaua`i

where Plaintiff resides and is responsible for issuing the Amended Emergency

Rule #6, in accordance with the Fourteenth Supplemental Proclamation, which

resulted in Plaintiff being forced to wear a mask at the Kaua`i Athletic Club on

October 2, 2020.[5] Successive mask rules related to the "Supplemental

Proclamation Related to Covid-19" have continued to cause injury to the plaintiff

---

[5]
https://www.kauai.gov/Portals/0/Civil_Defense/EmergencyProclamations/Mayor%
27s%20Emergency%20Rule%20%236%20Re-Instated%20AMENDMENT%201_
20200724.pdf

everyday since.

## Legal Context

33. The Supreme Court of the United States has adopted three standards of review concerning constitutional challenges to federal or state laws whenever a claim is made that a federal or state law violates a constitutional right of a citizen. From least protective of plaintiff's rights to most protective of plaintiff's rights, these three standards of review are: Rational basis, intermediate, and strict scrutiny, respectively. A rational basis standard means the law must be rationally related to a legitimate government interest, intermediate standard of review means a law must address an important government interest and must do so by means that are substantially related to that interest, and strict scrutiny requires that the law furthers a compelling governmental interest and must be narrowly tailored to achieve that interest. Once a court determines that a strict scrutiny standard of review must be applied to the law, it is presumed that the law or policy is unconstitutional, and the government then has the burden of proving that its challenged law is constitutional.

34. The more fundamental the right that is being violated by the government, the higher the standard of review and the greater the chance the law will be struck down as unconstitutional. Typically, if a right is explicitly stated in the

Constitution, such as in the Bill of Rights, a violation of that right by the government will draw the highest, strict scrutiny standard of review.  The right to freedom of speech, free expression and religious belief, the basis of this constitutional challenge, is specifically stated in the United States Constitution under the First Amendment and therefore draws a strict scrutiny standard of review. A Ninth Amendment argument centered on the most fundamental of all human rights - the right to life itself through oxygen - should command a strict scrutiny standard of review as well, and the lack of precedence in adopting strict scrutiny on a Ninth Amendment claim should not deter the court from ruling on these grounds, given the acute nature of the claim.

35. As mentioned the strict scrutiny standard of review for any law requires a two-pronged test: 1) The law must address a compelling governmental interest, and 2)  the law must be narrowly tailored to achieve that interest.  The court may strike down a law if it fails either prong of this test.  However, under strict scrutiny a law may also be struck down if it can be shown there is a less invasive way to achieve the same compelling government interest.  For instance, if the compelling government interest for requiring face masks in public is to decrease spread of Covid-19 and a better way to achieve that goal, calling on all the most reliable scientific data as well as relying on basic logic and understanding of human

behavior -- all while simultaneously protecting plaintiff's right to breathe freely and her right to free speech -- is to instruct anybody coughing in public to cough into the crook of their elbow and specifically *not* into a mask, then the court has full authority to strike down the "Supplemental Proclamation Related to the Covid-19 Emergency" as unconstitutional even if it passes both prongs of the strict scrutiny test.

<u>The Constitution is not canceled in times of emergency</u>

36. Unlimited power wielded upon the mere assertion of "emergency" is unconstitutional. The Hawai`i statute authorizing the Defendants' emergency powers expressly states the law confers no power or authority to act "which is inconsistent with the Constitution and laws of the United States."[6] The U.S. Supreme Court has expressly condemned the idea that a mere declaration of an "emergency" be an excuse to trump all constitutional forms of power, rights, and protections:

> *Emergency does not create power. Emergency does not increase granted power or remove or diminish the restrictions imposed upon power granted or reserved. The Constitution was adopted in a period of grave emergency. Its grants of power to the federal government and its limitations of the power of the states were not determined in the light of emergency and they are not altered by emergency. What power was thus granted and what limitations were thus imposed are questions*

---

[6] HRS § 127A-1(c).

*which have always been, and always will be, the subject of close examination under*
*our constitutional system.*

*Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 425-426 (1934) (emphasis

added).

<u>The Ninth Amendment was written for a situation such as this</u>

37. While the Ninth Amendment does not guarantee any specific

constitutional right, "to reject the Ninth Amendment as a source of substantive

rights would be to accept the precise argument it was intended to nullify." *State v.*

*Abellano*, 441 P. 2d 333 - Haw: Supreme Court 1968. That argument is that a right

so absolutely vital to the existence of life itself - the right to breathe - is so

obviously fundamental that there is no need for it to be so stated within the Bill of

Rights, and that failure to enumerate must never be construed as an opportunity for

the government to deny the right exists. There are fundamental principles of

freedom that simply cannot be ignored and to quote the Supreme Court on this

matter: "What these fundamental principles are, it would perhaps be more tedious

than difficult to enumerate." *Corfield v. Coryell*, 6 F. Cas. 546 - 1823. The

Supreme court has also said, "The Ninth Amendment is a reservoir of personal

rights necessary to preserve the dignity and existence of man in a free society" and

so it should be recognized that this Amendment was intended to protect one's right

to breathe freely of the element that gives life, to regulate their own health and to simply be left alone. "The Ninth Amendment is the place to which we must turn for protection of individual liberty from infringements not enumerated, and perhaps not contemplated, by the founding fathers." *State v. Abellano*, 441 P. 2d 333 - Haw: Supreme Court 1968

<u>Face mask requirements implicate the First Amendment</u>

38. A regulation which restricts protected expression based on the content of speech is constitutional only if it withstands strict scrutiny. Communication and expression of ideas is not merely limited to actual words. Facial expression is a fundamental component of effective human communication and can often convey messages without any inclusion of speech. Courts "have long recognized that [First Amendment] protection does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989).

**Facts**

<u>Face masks remove the right to receive expression</u>

39. When out in public it is not uncommon to refrain from speaking to others because of the frustration in trying to comprehend what they are saying behind a mask. Face masks act like a muzzle making speech unintelligible and inaudible resulting in the suppression of typical human interaction. The right to freedom of

speech includes not only the right to use your voice or to put words in print, but also the right to distribute, the right to receive, and the right to read (*Martin* v. *Struthers,* 319 U. S. 141, 143) and "reading" can be assumed to include reading expressions and reading lips. When your primary method of communication is lip reading and facial expression, prohibiting the exposure of the mouth makes it impossible to receive communication.

40. Facial expression is the main form of language between an infant and its caretakers. To remove this aspect of language is to disrupt the natural functions of human communication and is therefore an infringement upon the content of speech, particularly for infants. To rob a small child of their right to receive communication by erasing all facial expressions is not only unconstitutional, it is child abuse. To be prohibited from displaying a smile to others inhibits Plaintiff's ability to convey a non-verbal message. This simple expression is a critical component involved in the development of trust and human connection, thereby infringing upon Plaintiff's right to free association with others as well. The freedom to associate is not enumerated within the Constitution or the Bill of Rights "yet the First Amendment has been construed to include certain of those rights," and "the First Amendment has a penumbra where privacy is protected from

governmental intrusion." *Griswold v. Connecticut*, 381 US 479 - Supreme Court 1965.

### Mask Regulations Act To Prohibit Disfavored Speech

41. "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." *Turner Broad. Sys. v. F.C.C.,* 512 U.S. 622, 643, 114 S.Ct. 2445, 2459, 129 L.Ed.2d 497 (1994). As much as a mandatory mask requirement acts to serve as a symbol of compliance to the rules of the "Cult of Covid", so too does it then act as a law to prohibit disfavored speech when *not* wearing a mask would then signify your disagreement with the cult. A cult is a social group that is defined by its unusual religious, spiritual, or philosophical beliefs, or by its common interest in a particular personality, object, or goal.[7] Absent any scientifically proven data that mask wearing by healthy individuals serves the intended goal purported by Governments, those within authoritative positions, including the Defendants, are not acting in a manner aligned with science but rather in accordance with the "Cult Covid", in which its members maintain an unusual, irrational obsession with the idea that they can eradicate a virus by covering their face.  "[T]he Supreme Court

---

[7] https://en.wikipedia.org/wiki/Cult

has made clear that an activity may be religious even though it is neither a part of nor derives from a societally recognized sect." *Malnak I* 440 F.Supp. at 1313

42. The rules around wearing a mask are so incredibly arbitrary and capricious that any critically thinking individual can plainly see that mandating their use is much more akin to a cult-like ritual than to serve a significant medical purpose. If the latter were the case only more effective N-95 type masks would be appropriate, not a bandana that sits on the dashboard and hasn't been washed in months. Witnessing the blind obedience even in the face of arbitrary and nonsensical rules, in addition to a lack of science supporting efficacy, is a clear indication that the government has taken "guardianship of the public mind", which is unlawful according to the Supreme Court:

> "The First Amendment is a value-free provision whose protection is not dependent on `the truth, popularity, or social utility of the ideas and beliefs which are offered.' *NAACP* v. *Button,* [371 U. S. 415, 445 (1963)]. `The very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind . . . . In this field every person must be his own watchman for truth, because the forefathers did not trust any government to separate the true from the false for us.' *Thomas* v. *Collins,* [323 U. S. 516, 545 (1945)] (Jackson, J., concurring)." *Id.,* at 1455.

Quoting *Meyer v. Grant*, 486 US 414 - Supreme Court 1988 at 420

<u>Forced masking is intended to mandate a feeling of unity</u>

43. Dr. Anthony Fauci, head of the National Institute of Allergy and Infectious Disease, and one of the leading health experts in our country, has been

quoted on two occasions affirming what Plaintiff has stated above. On March 8,

2020 he told Dr. Jon LaPook on an episode of 60 Minutes:

> "There's no reason to be walking around with a mask. While masks may block some droplets, they do not provide the level of protection people think they do. Wearing a mask may also have unintended consequences: People who wear masks tend to touch their face more often to adjust them, which can spread germs from their hands." [8]

Then on May 27, 2020 Dr. Fauci told CNN he wears a face mask:

> "because I want to make it be a symbol for people to see that that's the kind of thing you should be doing."[9]

On July 13, 2020 CNN also reported:

> A face mask is more than a piece of cloth. It's a sign of respect.
>
> "Wearing a mask, ladies and gentlemen, is respect," Dr. Padmini Murthy, professor and global health director at New York Medical College, said during a United Nations panel. [10]

In a March 12, 2020 article in Time.com Ria Sinha, a senior research

fellow at the University of Hong Kong's Center for the Humanities and

Medicine, tells TIME:

> Wearing a mask, she explains, has become a "symbol and a tool of protection and solidarity"—even if research proving their efficacy is

---

[8] https://www.youtube.com/watch?v=PRa6t_e7dgI

[9] https://www.cnn.com/videos/health/2020/05/27/dr-fauci-intv-coronavirus-wear-mask-sot-nr-vpx.cnn

[10] https://www.cnn.com/2020/07/13/health/masks-respect-coronavirus-wellness/index.html

lacking. "Mask wearing is not always a medical decision for many people, but bound up in sociocultural practice," she adds.[11]

Dr. Mark Smolinski, an infectious disease physician explains why wearing a mask acts as a symbol of respect for others in a Forbes article dated June 25, 2020, where he says:

"You wear a mask to protect others, and others wear a mask to protect you. Wearing a mask is a true sign of respect for others."[12]

A medical doctor from America's Frontline Doctors explains in a press conference:

"We know these regular masks don't work against viruses... That's simply what it is... All viruses can get through... The reason we wear a mask… is because the fear is so massive in this country. I wear a mask so people don't think I don't care about them." [13]

44. It has become clear that the ritual of mask wearing is a form of symbolic expression intended to portray a "particularized message" and that the regulation imposed through the current "Supplemental Proclamation Related to the Covid-19 Emergency" is an attempt by the Defendants to mandate "a feeling of unity in its

---

[11] https://time.com/5799964/coronavirus-face-mask-asia-us/

[12] https://www.forbes.com/sites/coronavirusfrontlines/2020/06/25/wearing-a-mask-is-a-sign-of-mutual-respect-during-the-coronavirus-pandemic/?sh=669e79055645

[13] https://youtu.be/Ko6qCib1_YM

citizens". Non-verbal conduct implicates the First Amendment when it is intended to convey a "particularized message" and the likelihood is great that the message would be so understood. See *Nunez v. Davis*, 169 F. 3d 1222 - Court of Appeals, 9th Circuit 1999. By refusing to take part in this act of symbolism intended to portray a message of compliance, duty and "respect for others" Plaintiff is then also subjected to restrictions on free movement by being denied entry into most public spaces. Freedom of movement is the most fundamental aspect of the "right to be let alone" - which is the cornerstone of a free society - and so well articulated by Justice Brandeis:

> "The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone — the most comprehensive of rights and the right most valued by civilized men."

*Olmstead* v. *United States,* 277 U.S. 438, 478 (1928) (dissenting).

<u>Requirements for a public health emergency in Hawai`i</u>

45. On March 5, 2020, Governor of Hawai`i, David Y. Ige issued the first "Proclamation Related to the Covid-19 Emergency".  In issuing the Proclamation, Governor Ige invoked the Emergency Management Section of Hawai`i Revised Statute (HRS), HRS 127A, which grants broad powers to the governor of Hawai`i

to issue orders to protect the public in cases of disaster. HRS 127A-2 defines

disaster as:

> "any emergency, or imminent threat thereof, which results or may likely
> result in loss of life or property and requires, or may require, assistance from
> other counties or states or from the federal government."

HRS 127A-2 defines emergency as:

> "any occurrence, or imminent threat thereof, which results or may likely
> result in substantial injury or harm to the population or substantial damage to
> or loss of property."

To date Covid-19 has not proven to qualify as an emergency nor a disaster in the

state of Hawai`i according to these definitions.

### Viruses are rarely both deadly and contagious

46. A virus that is highly contagious but is not very deadly, such as the flu,

will not qualify as a public health disaster under HRS 127A-2.

47. A virus that is very deadly but is not very contagious, such as  HIV-1,

will not qualify as a public health disaster under HRS 127A-2.

48. Only a virus that is both deadly and contagious will qualify as a public

health disaster under HRS 127A-2.  Due to the nature of viruses (e.g., it is not

beneficial for a virus to kill its host, so many viruses mutate quickly to be less

deadly), it is very rare for a virus to be both deadly and contagious.

49. The court is expected to base its decisions on facts, reason and logic, not hysteria.  If a systematic, fact-based approach to reviewing Covid-19 data is used, the court will likely determine that Covid-19 is very similar to other coronaviruses that have been around for centuries, i.e., contagious but not very deadly - much like the flu.

<u>How a lay person can tell if a virus is deadly or contagious</u>

50. Any lay person, politician, or judge can evaluate if a virus is deadly or contagious by requesting only two numbers from health officials:  1) The number of people who have died from the virus, and 2) the number of people who have been infected with the virus.  Scientists divide the number of deaths by the number of infections, then multiply the resulting number by 100 to get a number called the mortality rate, which is reported at a %.  The higher the mortality rate, the more deadly a virus. Relatively innocuous viruses like the flu and Covid-19  have a mortality rate of 0.1% to 1%.  Intermediate viruses have a mortality rate in the 1% to 10% range, and the most deadly viruses have mortality rates that are greater than 10%.

51. It is clear from the data at the local level that the overall consequence of Covid-19 in the state of Hawai`i is in fact comparable to the flu, when it has now been nearly a year and we have only seen a little over 400 deaths (with inaccurate

death reporting). Any given flu season results in an average of 600 deaths in the state. To claim that a state of "emergency" exists in the county in which Plaintiff resides and that a mask rule is necessary is absurd given the fact that Kaua`i has recorded merely one alleged death from Covid-19 and is reporting a mortality rate of 0.5%.[14]

<u>Mislabeling of deaths, and false reports of excess death are fueling a "pandemic" that never was</u>

52. Looking at the data from the CDC for totals beginning in 1999 up to 2018[15] as well as 2019 it appears that an underestimate for expected deaths for the year 2020 in the United States may be at fault for what seems to be a rise above the expected national average due to Covid-19.[16] The CDC reports the total deaths increased in large amounts from 2009 to 2016 and then suddenly stopped increasing in 2018 and 2019. While that is possible, it is worth noting as a potential error or fraudulent representation of the data. The most obvious falsification or error in the CDC's method, though, is in its estimation of expected deaths in 2020 by averaging the total deaths from 2017, 2018, and 2019. Using the CDC's

---

[14] https://hiema-hub.hawaii.gov/pages/covid-dashboard
[15] https://wonder.cdc.gov/controller/saved/D76/D91F606
[16] https://gis.cdc.gov/grasp/fluview/mortality.html [Numbers for 2019 were determined by adding column "K" from rows 171 to 222 which are data for weeks 1-52 of 2019]

numbers provided the average total deaths for the years 2017, 2018, and 2019 is 2,832,835. This means that the CDC expected 2,832,835 deaths in 2020; *and it means that the CDC expected the total deaths to actually decrease in 2020 compared to previous years*. The CDC's method actually results in a lower number of expected deaths in 2020 than the CDC reports for both 2018 and 2019. The total deaths in the U.S. have reportedly not decreased compared to a previous year since 2009. In fact, according to the CDC's data referenced above, the deaths significantly increased several years up until 2017, 2018, and 2019 when the CDC reports that total deaths suddenly remain almost the same, despite the continued rise in population.

53. All Covid-19 related data, including death numbers and test results, should be made available to the public immediately at the county level showing detailed death counts from each hospital or city coroner. Data that is available in this manner for public scrutiny allows inaccuracies and possible fraud to be exposed and corrected right at the source. This type of transparency should be required before any public health emergencies can be declared or extended at either the county or the state level, especially now that we have been dealing with the Covid-19 disease for nearly a year and know a lot more about it.

<u>The burden of proof is on the Defendants</u>

54. It is not up to the plaintiff to establish the mortality rate of Covid-19 in Hawai`i.  Once it has been shown that the "Supplemental Proclamation Related to the Covid-19 Emergency" must pass the strict scrutiny standard of review for violating plaintiff's fundamental, constitutionally protected rights, then the burden of proof shifts to the government to establish the most accurate mortality rate possible for Covid-19 in every county in Hawai`i and to establish that the mortality rate in *every county in Hawai`i justifies the claim of a public health emergency*, thereby meeting the first prong of the strict scrutiny standard of review that requires a compelling government interest in violating plaintiff's civil liberties. Simply repeating talking points coming from health officials thousands of miles away in Washington, D.C., that Covid-19 is a public health emergency is too vague to pass strict scrutiny.

55. Since the initial declaration of a state of "emergency", the Defendants have provided no empirical, scientifically nor medically proven evidence that 1) a state of "emergency" exists in this jurisdiction; 2) that the face mask requirement is a scientifically proven and medically sound mechanism for achieving the intended goal; and 3) that all risks involved in mandating a medical intervention upon a healthy population has been weighed against the benefits. In *Nunez v. City of San Diego* a city ordinance enforcing a juvenile curfew was found to not pass the rigors

of strict scrutiny due to the fact that the government could not "demonstrate that its classification [was] precisely tailored." *See Plyler,* 457 U.S. at 217, 102 S.Ct. at 2395; *see also Hutchins,* 942 F.Supp. at 678 (concluding that the District of Columbia could not adopt the curfew ordinance upheld in *Qutb* without its **own evidence showing the particular effectiveness of a nocturnal juvenile curfew in meeting its compelling interests**) (emphasis added). "The first piece of evidence is a Justice Department report on juvenile offenders and victims. It shows a rising juvenile crime rate in the **nation as a whole but does not provide information specific to San Diego**." (emphasis added) For this reason the court found "that the City has not shown that the curfew is a close fit to the problem of juvenile crime and victimization because the curfew sweeps broadly." See *Nunez v. City of San Diego*, 114 F. 3d 935 - Court of Appeals, 9th Circuit 1997. The court must find that there is a "close fit" to the problem of "Covid-19" within the jurisdiction Plaintiff resides in order to claim a regulation in this jurisdiction has been narrowly tailored.

56. Without providing the court and the public readily available data showing evidence to the contrary that mortality rates for Covid-19 in Hawai`i are akin to or even less than the seasonal flu, no city, county, state or public official in Hawai`i can declare a public health emergency under HRS 127A-2. With no public health emergency, there is no compelling government interest to require citizens

like plaintiff to wear face masks in public under the "Supplemental Proclamation

Related to the Covid-19 Emergency", and the Proclamation fails the first prong of

the strict scrutiny standard of review.

<u>There is no scientific proof face masks reduce the spread of disease when
worn by healthy individuals</u>

57. A study published by the CDC on September 11, 2020 reports that 70%

of those in the study who tested positive for Covid-19 always wore a face mask,

while 74% who tested positive never covered their face. This study reveals that the

wearing of a face mask creates no significant reduction in transmission of

SARS-CoV-2.[17]

58. A document from the Public Health Agency of Canada (PHAC) openly

admits there is little evidence that, if one is well or healthy, wearing a mask will

protect the wearer. The PHAC document states:

> "Little evidence exists as to how effectively the wearing of a mask by well
> individuals will prevent them from becoming infected … For masks to be
> effective, individuals must wear them consistently and correctly; these
> actions can be challenging. Masks must be worn only once, never shared and
> always changed when soiled or wet. If not used properly, masks may lead to
> a greater risk of pandemic influenza transmission because of contamination,
> or they may make the user overconfident and hence neglectful of other
> personal protective measures, such as hand hygiene, respiratory etiquette and
> self-isolation when ill – measures that have been deemed important
> complementary actions to the use of masks for the reduction of disease
> transmission. Finally, given that masks cannot be used when eating and

---

[17]

https://www.cdc.gov/mmwr/volumes/69/wr/mm6936a5.htm?s_cid=mm6936a5_w

drinking and may make communication difficult, wearing them for prolonged periods may be impractical and ineffective." [18]

59. To date, and even with much more advanced methods of detection than those used by researchers such as W.F. Wells back in 1934, there are still no definitive studies showing any virus particles (flu, cold, Covid-19) that are capable of traveling long distances from an infected person in the form of dried out aerosol dust particles and yet still remain alive and capable of causing disease.[19]  In fact the most definitive paper to date regarding the efficacy of masks in slowing the spread of various viruses including coronaviruses indicates a person infected with a coronavirus in particular must cough to produce droplets or aerosols that contain any form of the virus, dead or alive.[20]  Coronavirus patients who did not cough during the 30 minute time frame of the experiment produced droplets and aerosols that had no detectable traces of coronavirus, rendering moot the entire argument

---

[18] https://www.canada.ca/en/public-health/services/flu-influenza/canadian-pandemic-influenza-preparedness-planning-guidance-health-sector/public-health-measures.html#a21

[19] "On Air-borne Infections:  Study II. Droplets and Droplet Nuclei", W. F. Wells, *American Journal of Epidemiology*, Volume 20, Issue 3, November 1934, Pages 611–618, https://doi.org/10.1093/oxfordjournals.aje.a118097

[20] Leung, N.H.L., Chu, D.K.W., Shiu, E.Y.C. *et al.* Respiratory virus shedding in exhaled breath and efficacy of face masks. *Nat Med* 26, 676–680 (2020). https://doi.org/10.1038/s41591-020-0843-2

about whether Covid-19 could travel long distances in the form of a dried out

aerosol dust particle from an infected person who was just breathing and talking

because there are no virus particles to test, dead or alive.  These results also render

moot any arguments for the efficacy of masks in slowing the spread of Covid-19

from infected people who are just breathing or talking, once again because there

are no Covid-19 particles for the mask to stop in the first place.  This is in

agreement with reports from the World Health Organization that asymptomatic

spread of Covid-19 (i.e., spread of Covid-19 from people who are not coughing)

appears to be very rare:

> "From the data we have, it still seems to be rare that an asymptomatic person actually transmits onward to a secondary individual," Dr. Maria Van Kerkhove, head of WHO's emerging diseases and zoonosis unit, said at a news briefing from the United Nations agency's Geneva headquarters. "It's very rare." The virus is primarily spread via respiratory droplets when someone coughs or sneezes or if they touch a contaminated surface, scientists say. (From "Asymptomatic spread of coronavirus is 'very rare,' WHO says," available at https://www.cnbc.com/2020/06/08/asymptomatic-coronavirus-patients-arent -spreading-new-infections-who-says.html, June 8, 2020)

60. According to the most definitive study on the efficacy of masks in

slowing the spread of Covid-19 (*cited above*), masks are useless in stopping the

spread of Covid-19 in infected individuals who are only breathing or talking.

Masks are only possibly effective at blocking the spread of Covid-19 droplets and

aerosols when an infected person coughs, and even this is not definitive because the study never measured if the virus particles collected in these droplets or aerosols were even alive. In addition, this method of prevention of spread of Covid-19 (blocking aerosols and droplets of an infected person who is coughing from being spread long distances) is just as easily achieved by having the infected individual cough into the crook of their elbow.  Given the high probability of increased spread of Covid-19 from people touching their contaminated masks, coughing into the crook of the elbow is in fact the preferred method of slowing the spread of Covid-19 over mask use.

61. While there is no evidence that masks help to decrease spread of Covid-19 in a way that can not be achieved just as easily as by having infected people cough into the crooks of their elbows, there is substantial evidence that masks most likely increase surface spread of Covid-19 and that this should still be a major concern for the CDC as well as for any politicians issuing blanket face mask orders at the state and local level based solely on CDC recommendations. It seems that no one is making decisions based on clear science, but instead is adopting whatever the current narrative may be to promote increased fear.

Evidence of possible decrease in oxygen intake for mask wearers must be included to refute arguments that masks are "harmless"

62. One of the main arguments in favor of face mask orders in the supposed absence of data on how Covid-19 may be transmitted is that mandating masks has no downside.  Blatant rights violations aside, another possible downside is the effect masks may have on decreasing oxygen intake for the mask wearer, among other health risks studied concerning masks.  Most of the studies in this area have been carried out on special N95 masks worn by health care professionals, but there is no reason to assume that other types of masks being mandated by the government for public use do not pose at least some risk in this area, a risk that should not be completely ignored in debates over face mask orders, as is currently happening. The State simply cannot claim it is declaring an emergency to save life and then take actions to harm it.

63. These studies, that are readily available to policymakers including the Defendants and their advisors, can not be ignored when public health officials try to make the argument that there is no downside to widespread public face mask mandates, even when taking into consideration all the exceptions and exemptions typically listed along with the orders. Many businesses are refusing to allow access to their establishment to those who are not donning a face mask, even when they have a legitimate medical exemption. These business owners and employees are being coerced by their government to violate the Americans with Disabilities laws

out of fear of forced closure or fines. In this respect, not only does the mask

wearing pose a health risk to all wearers, it is leading to discrimination and

division within communities, further exemplifying how it acts as a symbol of

inclusion among the cult and a method to prohibit disfavored speech.

64. Safety Specialists working for the Occupational Safety and Hazard

Administration play an important role in protecting the health and safety of

individuals in the workplace. One of the tasks of specifically trained specialists is

to evaluate the safe use of personal protective equipment (PPE) by employees to

ensure it is necessary and used properly. If an employee is exposed to a hazard and

the possible need for PPE arises, that individual must undergo a physical

examination and be properly fitted. Great care is taken to evaluate all aspects

including the air quality of the environment before the individual is asked to work

for an extended period of time while wearing PPE. These steps are taken to ensure

the safety of the employee because the science has already existed for decades that

overexposure to carbon dioxide and a reduction in oxygen intake can lead to

cognitive impairment, headaches and other adverse effects which can lead to

serious injury. How is it possible that all of these protocols are suddenly

completely disregarded and instead the workforce throughout the entire nation is

being forced into complying with a medical intervention without any evaluation for

their safety nor any guidance for safe practices? This is a serious concern not only

for those working 40 hour work weeks, but also for the children being forced to

erase their smiles and expression for hours on end in the classroom, while being

placed at risk of brain damage through oxygen deprivation. Not only is the forced

mask wearing interfering with communication through the inability to read facial

expression and lip movement, our children are being deprived of oxygen which is

absolutely vital for their cognitive development and ability to learn and thrive.

**Conclusion**

65. The Defendant's "Supplemental Proclamation Related to the Covid-19

Emergency" requiring all citizens to wear a face mask while in public violates

plaintiff's First Amendment rights to free speech, expression, religion and privacy

and her right to breathe life-giving oxygen and to simply be left alone, protected

under the Ninth Amendment. The Governor's executive order and all

"Supplemental Proclamations Related to the Covid-19 Emergency" fail both

prongs of the strict scrutiny standard of review because government has not shown

the Covid-19 disease qualifies as a public health emergency under HRS 127A-2 in

any county in Hawai'i and because face masks  have not been proven effective in

slowing or stopping the spread of any influenza like illness and may actually

increase the spread of Covid-19 through surface spread.  In addition, face masks

may pose health risks to mask wearers by decreasing oxygen intake, and forcing

excess carbon dioxide intake, and there is no proof that healthy people are capable

of spreading disease just by breathing.  A better way to slow the spread of

Covid-19 that eliminates possible increases in contact spread, lowers health risks

caused by decreased oxygen intake, and protects plaintiff's First and Ninth

Amendment rights to free speech, expression, religious belief, privacy, free

association and the right to breathe, is to instruct citizens to cough into the crooks

of their elbows rather than wear masks.

### Prayer for relief

WHEREFORE, plaintiff respectfully prays that the court:

1. Enter a declaration that the "Supplemental Proclamation Related to
   the Covid-19 Emergency" is unconstitutional and void;

2. Enter a preliminary and permanent injunction barring defendants
   Clare E. Connors, David Y. Ige and Derek S.K. Kawakami from
   enforcing the "Supplemental Proclamation Related to the Covid-19
   Emergency" against plaintiff;

3. Enter a judgement for plaintiff;

4. Award fees and costs associated with filing this complaint to plaintiff;

Verified Complaint                    40

5.  Grant such further and other relief as the Court deems just and proper.

## Verification

I, Levana Lomma, am the plaintiff in the above-entitled action. I have read the foregoing and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true.  I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at Kapa`a, Hawai`i.

DATED:  02/28/2021

_Levana Lomma_
_____
Levana Lomma